BERNADINE WOLFE *v.* RUSSELL S. WOLFE
(No. 8705)

Submitted May 24, 1938.   Decided June 28, 1938.

*C. S. Kump* and *Donald K. Crawford,* for appellant.

*E. L. Maxwell,* for appellee.

RILEY, JUDGE:

Bernadine Wolfe brought this suit in equity in the circuit court of Randolph County against Russell S. Wolfe for the purpose of obtaining an absolute divorce, the custody of Lois Elaine Wolfe, aged three, child of their marriage, and a decree for the support and maintenance of herself and child. From a decree granting plaintiff an absolute divorce, the custody of her child, subject to the provision that it be retained in the possession of its maternal grandmother, and directing defendant to pay her $75.00 per month for the support of herself and child, the defendant prosecutes this appeal.

The bill of complaint charges cruel treatment as the only ground for divorce. Generally, it charges that defendant has been "guilty of extreme and repeated cruelty toward the plaintiff in this that he is a man of high temper and used toward the plaintiff obscene and abusive

language without any provocation; and has used personal violence toward the plaintiff that she was unable to resist"; and, in particular, that on May 11, 1936, the defendant, without any just provocation, struck the plaintiff many violent blows and so injured her that, at the time of the bringing of this suit, she was confined to her bed under the care of a doctor with her teeth knocked out and loosened and her face beaten, wounded, cut and her foot broken.

The answer denies that defendant committed any acts of cruelty toward the plaintiff. It especially denies the detailed allegations of the assault on May 11, 1936. It admits, however, that he slapped the plaintiff, but "the said blow was not in any way sufficient to cause any injury to the plaintiff"; and that any injuries sustained by plaintiff "were brought about by her own actions in trying to kick, beat and strike the defendant, and by falling down the stairs." By way of cross-bill, the defendant charged plaintiff with desertion, cruelty, habitual drunkenness and adultery, and prayed for a divorce from her and for the care and custody of the infant child. Specifically, the cross-bill charged the plaintiff with being "lovable, affectionate and passionate toward other men", with improper conduct with other men, and with entertaining them in her home and in the homes of others when the defendant was out of town; that plaintiff had left the City of Elkins and gone to Washington, where she had engagements with other men; that on another occasion, she had supposedly made a trip to Washington, but went to New York, where she committed adulterous acts with parties unknown; and that on April 13, 1936, plaintiff, against defendant's expressed wishes, went to Charleston, West Virginia, where she stayed two weeks, having dates with other men and meeting them in their hotel rooms, committing adulterous acts with parties unknown, and traveling about having herself introduced as Miss Bernadine Mason. The cross-bill further charges that on the_____day of June, 1935, in the Ritz-Carlton Hotel at Atlantic City, New Jersey, plaintiff had com-

mitted adulterous acts with one Dr. Joseph Mountin. By the final decree, defendant, there being no objection, amended his answer, which amendment charged the plaintiff with having committed adulterous acts at Atlantic City at the said time and place with a party or parties unknown to defendant.

After a reference to a commissioner, plaintiff filed before him her answer and replication to the defendant's answer and cross-bill, in which she joined issue on the material allegations of the answer and denied the material allegations of the cross-bill. Therein, she admitted the trips to Washington, Charleston and New York, but denied the alleged adulterous acts on her part in said cities. She further denied that she had committed any adulterous act with Doctor Joseph Mountin in the Ritz-Carlton Hotel in Atlantic City.

Plaintiff moved to stay this appeal on the ground that the defendant was in contempt of the Circuit Court of Randolph County for failure to comply with a decree of January 7, 1938, entered after the appeal was granted, providing for the payment of $75.00 per month for the maintenance of herself and child, $40.00 suit money and $100.00 to plaintiff's attorney for his services in this Court. The contempt order was entered on May 19, 1938.

The sole question arising on the motion to stay is whether, after an appeal has been perfected in this Court, any steps can be taken in the trial court which would form the basis for the interference with the appeal. On this question, we must follow our own practice and procedure. This Court, in the case of *Clemens* v. *Southern, Judge,* 105 W. Va. 18, 141 S. E. 395, held, in effect, that in a non-support case, originally instituted before a justice under section 16-c (4), chapter 144, West Virginia Cumulative Statutes, 1925, the appellate court, after the perfection of an appeal, had no jurisdiction to issue a warrant of arrest of appellant and require him *pendente lite* to pay the installments of support money ordered to be paid by the justice. This case substantially held that

the limit of appellee's rights was to secure "an affirmance of the judgment appealed from," and to pursue the statutory remedy on the bond provided by the statute. By analogy, the decree of January 7, 1938, awarding support, suit money and an attorney's fee, as well as the contempt order of May 19, 1938, entered as they were, by the circuit court after the perfection of this appeal, are purely abortive so far as the motion to stay the appeal is concerned. This position, at least so far as the question of divorce and the custody of a child is concerned, is supported by respectable authority. 2 Am. Jur., Subject, Appeal and Error, sec. 203; *The People ex rel. Crymble* v. *Horton*, 46 Ill. App. 434; *Eastes* v. *Eastes*, 79 Ind. 363; *Dwelly* v. *Dwelly*, 46 Me. 377. Though other courts, in a number of cases, have taken the opposite view, we are constrained by our own practice, which we think is steeped in sound principle, to overrule the motion to stay.

The evidence in this case is voluminous. The testimony of many witnesses was heard. The learned trial chancellor rendered an able opinion, upon which we, in many of its particulars, have leaned heavily. The record has been considered carefully, yet it would be unprofitable to review, in *seriatim* and in detail the testimony of the many witnesses. A general perusal will suffice.

Plaintiff and defendant were married in Elkins on April 25, 1931. Both apparently stood high in the community and were college-bred. The defendant was engaged as a specialist in the treatment of the eye, ear, nose and throat. For several years after their marriage, their relations were amiable and their child was born. Thereafter, and up until the time of the separation on May 11, 1936, their relations became increasingly strained, and marital difficulties mounted up between them. Shortly after their marriage, they moved to the home of the plaintiff's parents. From a few months shortly before the marriage and up to the time of their separation, plaintiff worked in defendant's office, where she assisted him in taking care of the account books and

making deposits in the bank. Her employment in the office after marriage was in conformity with a contract which she asked defendant to sign. Though denied, there is evidence that, because of extreme jealousy, her attitude in the office, especially toward women patients, was not conducive to her husband's success in his practice. The record discloses, at least until about the time of the separation, he enjoyed a lucrative practice which produced an income of about $10,000.00 a year. Notwithstanding this, at the time the depositions were taken, he was in debt to the extent of about $7,000.00, and his practice had decreased materially. Evidently, as the trial chancellor suggested, "they must have spent large sums for living and traveling expenses." She admitted that while working for her husband she, sometimes with and sometimes without her husband's knowledge, kept money out of his bank deposits in the usual amount of $65.00 or $70.00 a month. There is testimony, which she denies, that her withdrawals at times greatly exceeded these amounts. To a large extent, both indulged in the pleasure of entertaining and being entertained.

Notwithstanding the severe allegations of the bill of complaint as to the general charges of cruelty by defendant, there is no substantial evidence that the defendant, prior to May 11, 1936, used any personal violence. True, prior to that date, plaintiff had consulted counsel, in Clarksburg and Elkins, West Virginia, about a separation. In fact, orally and by letter, she had notified defendant to move out of the house. On the day before May 11, 1936, she and her mother went to a home on an unimproved road outside the City of Elkins where her mother and child were to go on the following day. Evidently this was done so that neither the grandmother nor the child would be witnesses to the happenings in the home on the following morning. According to the maid, on the morning of May 11, 1936, the defendant came down stairs, evidently in a good humor, and inquired about the whereabouts of the child. She did not know and so informed defendant. At or near the door

of the house, he was met by plaintiff who asked him where he wanted his clothes sent. He then asked her where the child was. According to defendant's testimony, plaintiff, in substance, said: "Well, you'll never find out!" In this he is not fully corroborated by plaintiff, although she testified that she refused to tell him. Plaintiff testified that, as a result of an altercation, which then followed, defendant administered to her severe injuries which required some time to heal. As to the extent of her injuries, she is corroborated by her father, who arrived at the house, after plaintiff telephoned him. The maid, to a lesser degree of corroboration, testified to plaintiff's injuries. But the physician who treated plaintiff was not called. Where a party fails to call an important witness, who has knowledge of the facts and the witness' absence is unexplained, it will be presumed that the evidence of such witness, if given, would be adverse to such party. *Mohr* v. *Mohr*, 119 W. Va. 253, 193 S. E. 121; *Miller* v. *Miller*, 111 W. Va. 338, 161 S. E. 566; *Thompson* v. *Beasley*, 107 W. Va. 75, 146 S. E. 885. See generally, 8 Michie's Digest, Virginia and West Virginia Reports, subject, Presumptions and Burden of Proof, sec. 9 (5), for other West Virginia cases.

Defendant testified, in part, that during the altercation he slapped plaintiff; she grabbed his tie; both fell; a scuffle followed; plaintiff then took the telephone and called her attorney; defendant "started to grab the telephone, and she jumped for the stairway and fell down to the landing—about five steps below—I went down after her, for obviously, she was hurt; so, I picked her up and put her on the bed—where Mr. Mason (her father) says he found her." His testimony as to the telephone call to the attorney is undenied. Be that as it may, the attorney, whose name was mentioned by plaintiff over the telephone, according to defendant, bore the same surname as the attorney whom she had consulted previously about a separation. That attorney, according to Mr. Mason, arrived shortly thereafter.

396

The commissioner found that defendant's actions were cruel treatment within the meaning of the statute (Code, 48-2-4, as amended and re-enacted by Chapter 35, Acts of the Legislature, 1935), and based the decree on this finding. But taking the plaintiff at her word and assuming as true the findings of fact by the trial chancellor, we must review these facts with the law which governs cases such as this. Of course, the common law right of a husband to chastise his wife is not recognized in this state. If ever such a right existed, it is obsolete, brutal and beyond the scope of present-day mores. Nevertheless, as stated in 9 R. C. L., subject, Divorce and Separation, section 353, "in considering whether acts of physical violence on the part of the defending spouse constitute cruelty the courts generally recognize that provocation given by the complaining spouse is always a material matter for consideration and may be such as to prevent the husband's conduct from constituting cruelty." Citing, *Youngs* v. *Youngs*, 130 Ill. 230, 22 N. E. 806, 17 A. S. R. 313, 6 L. R. A. 548; *Hoshall* v. *Hoshall*, 51 Md. 72, 34 Am. Rep. 298; *Poor* v. *Poor*, 8 N. H. 307, 29 Am. Dec. 664; *Joyner* v. *Joyner*, 59 N. C. 322, 82 Am. Dec. 421; *Mosher* v. *Mosher*, 16 N. D. 269, 113 N. W. 99, 125 A. S. R. 654, 12 L. R. A. (N. S.) 820; *Nye's Appeal*, 126 Pa. 341, 17 Atl. 618, 12 A. S. R. 873.

Though before 1921, the father had the prior right to his child, nowadays, when the parents are living together, the right is equally divided between them. Code, 44-10-7. This is true from a purely legislative standpoint, as our statute is presently constituted; but over and above the statute, it is equally true that both the father and mother are interested in the welfare of their child as the result of a natural impulse. Such impulse stands above all human laws. Though, under the circumstances, we condemn and do not, in the least degree, justify the extreme measures indulged in by Doctor Wolfe, nevertheless, we can conceive of no greater provocation than the one under which he was put when his wife requested him to leave the home and told him, in

substance, that he had no right to know where the child was. That being so, while we accept fully the chancellor's findings of fact, we think the provocation not only tempered, but immunized defendant's actions on the morning of May 11, 1936. In fact, the affair on that morning was entirely mutual. The actions of the one seem to have balanced the actions of the other. It follows that Dr. Wolfe's treatment of plaintiff on that morning, resulting as it did from a planned provocation, is not cruel treatment within the statute, as to constitute a ground for divorce.

We agree with the trial chancellor that the defendant has not shown cruelty or desertion under his cross-bill. The fact that the plaintiff has not slept with defendant since the Cincinnati trip in September, 1935, is not, under the circumstances of this case, a ground for divorce. Ordinarily, denial of sexual intercourse is not desertion or cruel and inhuman treatment.

Whether plaintiff was guilty of cruelty in that she accused defendant of having committed adultery presents a legal question. There is evidence in the record that on one or two occasions, the defendant came into the home with his clothing in a condition which would indicate that he had been guilty of adulterous conduct. Plaintiff's testimony to that effect perhaps is tantamount to the accusation. Even if proven, as the trial chancellor said, that is not a ground for divorce. Of course, under our statute (Code, 48-2-4, as amended and re-enacted by Chapter 35, Acts, 1935), a charge of prostitution made by a husband against his wife falsely is deemed cruel treatment; but, neither by statute nor any decision of this Court, does the husband have the right to a divorce on the ground that his wife falsely accused him of adultery. *Roush* v. *Roush,* 90 W. Va. 491, 111 S. E. 334, Syl. 1.

The charge in the cross-bill that the plaintiff was guilty of habitual drunkenness is not sustained by the record. The record clearly discloses that plaintiff, as well as defendant, on occasions, indulged in the use of intoxicating liquors, at times to excess. But the entire record, from

page to page, as we have reviewed it, does not indicate that either party was habitually addicted to the use of intoxicating liquors.

The plaintiff admitted she took trips to Washington, to New York and to Charleston without her husband. The cross-bill alleges, in effect, that on these trips she engaged in adulterous conduct, but it takes no degree of legal acumen to say that because a wife happens to take a trip outside the city of her domicile without her husband that she thereby should be accused of adulterous conduct. Such is not the law in this state. It should never be the law. Nevertheless, this record, viewed coldly as we have tried to view it, and as the trial chancellor has indicated in his opinion, discloses such conduct on the plaintiff's part as would merit criticism. Her trip to Charleston was evidently without her husband's permission. There she went out with men and women in her husband's absence. On the occasion of her Charleston trip she was invited to a hotel, where, with other parties present, she partook of a drink (evidently intoxicating) in the private room of one of the guests, and thereafter left in an automobile, so a witness said, in the sole company of a man, and, according to other testimony, corroborated by her own, with a man and a girl friend of hers. She admits that she asked a man in Oakland, Maryland, who was a native of Baltimore, Maryland, to take her to Baltimore on his next visit. She further admits that, notwithstanding the fact she did not tell her husband, she went to the City of New York. There is testimony that while in New York she received a corsage and that she stated to one witness that she had a good time with an interne. One witness testified of her amorous approaches toward him. This testimony is also denied. While it is difficult, where there is a conflict, to distinguish between what is truthful testimony and common gossip, under oath, we have been impressed with the array of many disinterested witnesses who contradicted plaintiff on important matters bearing on her personal conduct.

But the charge of adultery on plaintiff's part cannot be predicated upon plaintiff's indiscreet actions in Elkins and on the occasion of her trips to Washington, New York, Charleston and Oakland. Her conduct does not satisfactorily indicate that she was guilty of adultery. The charge of adultery in divorce suits must be proven by clear, positive and satisfactory evidence. The degree of proof lies in the twilight zone required by the "beyond a reasonable doubt" rule in criminal cases and the "preponderance of evidence rule" in civil cases. To warrant a finding of adultery, said Sir William Scott (Lord Stowell), in *Loveden* v. *Loveden,* 2 Hagg. Const. 1, 3, 161 Eng. Full Reprint, 648, "the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion" that the accused party was guilty.

The claim that plaintiff committed adultery at the Ritz-Carlton Hotel in Atlantic City is based solely upon the testimony of a Mrs. Woodside. She testified that she walked up to the room occupied by Mrs. Wolfe, saw a man in a bathrobe walk out of the room while plaintiff was lying nude on the bed. The commissioner reported to the circuit court of Randolph County that this testimony of Mrs. Woodside was true, though he did not think plaintiff committed adultery. If his findings of fact are correct, undoubtedly, the trial chancellor would have been warranted in finding Mrs. Wolfe guilty of adultery. But we are not bound by the commissioner's findings. Neither was the circuit court. The findings of a commissioner in chancery, though entitled to great weight, are merely advisory to the trial chancellor. *Fanning, Adm'r.* v. *Dennis et al.,* 119 W. Va. 615, 198 S. E. 532. In view of Mrs. Wolfe's denial and the evident strained relationship which existed between Mrs. Woodside and Mrs. Wolfe, we cannot say that the circuit court erred in disregarding Mrs. Woodside's testimony. The reasons set forth in the court's opinion are decidedly clear. Certainly they are highly persuasive. It would be difficult for us to say they are clearly wrong. If not,

of course, we cannot disturb them. *Shipper* v. *Downey,* 119 W. Va. 591, 197 S. E. 355; *Highland* v. *Davis,* 119 W. Va. 501, 195 S. E. 604; *Spradling* v. *Spradling,* 118 W. Va. 308, 190 S. E. 537. Notwithstanding that the charge of adultery against Mrs. Wolfe on that occasion was not sustained, we think, as the circuit court said, that her actions on other occasions were indiscreet and subject to condemnation. At best, disregarding Mrs. Woodside's testimony, plaintiff's conduct was decidedly inequitable. We are unable to say that she was justified in concealing the infant child of her marriage from the husband, and equally, we are unable to say she was justified in her actions in Elkins, and on the trips to Washington, New York, Charleston and Oakland. Her conduct being decidedly inequitable, and having provoked defendant's only act upon which she had any ground for a divorce, she is not entitled to relief in a court of equity. A party in a suit for divorce, as in all other equity cases, must come with hands unsoiled and clean. Before relief can be obtained, a complaining party's own conduct must be beyond substantial reproach. *Edwards* v. *Edwards,* 106 W. Va. 446, 145 S. E. 813. The rule was well stated in *Maxwell* v. *Maxwell,* 69 W. Va. 414, 71 S. E. 571, as follows: "The rule that one who comes into a court of equity must come with clean hands is applicable to divorce proceedings. Courts of equity are not open to give relief to husband or wife if the complaining party be responsible in a substantial degree for the wrongs and injuries complained of." (Point 4, Syllabus.) See also, *Mohr* v. *Mohr, supra,* citing 2 Bishop, Marriage and Divorce, 169, sec. 350.

Equally, we think that the allegations of the cross-bill were not fully sustained. That being so, it becomes unnecessary to discuss the effect of the attempted amendment to the cross-bill contained in the final decree. As to the requirement to allege in divorce suits based upon adultery, the name of the *particeps criminis,* see *Trough* v. *Trough,* 59 W. Va. 464, 53 S. E. 630, 4 L. R. A. (N. S.) 1185, 115 Am. St. Rep. 940, 8 Ann. Cas. 837, in

which the question is queried, but not decided. As to the failure to verify under oath the amendment to the cross-bill as to the claimed adulterous conduct of the plaintiff in the Ritz-Carlton Hotel at Atlantic City, see Code, 48-2-11 (requiring all pleadings in divorce cases to be verified) ; and *Jennings* v. *McDougle*, 83 W. Va. 186, 98 S. E. 162, to the effect that where a statute requires all pleadings to be verified, an amendment to the pleadings, as material or necessary to the issue, must also be verified. However, as Mrs. Woodside was the only witness to the claimed episode in the Ritz-Carlton Hotel at Atlantic City, it seems, as the trial chancellor said, all the evidence on this question was fully adduced. Therefore, the question as to whether or not, under our practice and procedure, statutory or otherwise, the amendment was properly made, is moot. In fact, we can and do, as the trial chancellor did, consider this case as though the amendment was properly filed.

After weighing all the facts and circumstances portrayed by the record, we are constrained to hold that both the bill of complaint, as well as the cross-bill, should be dismissed, and the parties stand in the situation which they created when they became married in 1931. An order will be entered here accordingly.

*Reversed and entered.*